UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DEANGELO O. BERKELEY      :  Civil Action No. 06-4490(NLH)
                          :
                          :
       Plaintiff,      :
                          :
   v.                :  **OPINION**
                          :
JOHN E. POTTER,         :
Postmaster General, and    :
UNITED STATES POSTAL SERVICE,  :
                          :
       Defendants.    :
                          :

**APPEARANCES:**

F. Michael Daily, Jr., Esquire
Sentry Office Plaza
216 Haddon Avenue
Suite 100
Westmont, NJ 08108

    *Attorney for Plaintiff*

Paul A. Blaine, Esquire
Office of the United States Attorney
401 Market Street
4th Floor
Camden, NJ 08101

    *Attorney for Defendants*

**HILLMAN**, District Judge

    This matter has come before the Court on defendants' motion for summary judgment on plaintiff's claims for hostile work environment and disparate treatment based on his race and gender. For the reasons expressed below, defendants' motion will be granted.

## BACKGROUND

This case mainly involves an incident that occurred on July 29, 2004 between plaintiff and his supervisor at the United States Postal Service's South Jersey Processing & Distribution Center ("PDC").  According to plaintiff,[1] when he was working at the PDC on the evening of July 29, 2004, Kim Parker-McKeever, a Supervisor of Distribution Operations ("SDO"), asked him to weigh the third class mail "when he got a chance."  About a half hour later, Tim Oswald, the Manager of Distribution Operations ("MDO") who was senior to Parker-McKeever, questioned plaintiff about why he was not weighing the third class mail.  According to plaintiff, Oswald talked condescendingly to him and did not listen to plaintiff's reasons for why he had not yet started to weigh the third class mail.  One reason plaintiff related to Oswald was that Parker-McKeever had only asked plaintiff to do it when he had a chance since he was busy working on the first class mail.  Plaintiff claims that Oswald ordered him to do it immediately.

When plaintiff tried to walk away in order to begin weighing the mail, Oswald stopped in a narrow space at the same time plaintiff was passing through the space.  They brushed chests.

---

[1]Plaintiff's version of the events comes from his "Memo For Record" and his "EEO Investigative Affidavit," both of which plaintiff prepared for the Post Office's investigation into the EEO administrative charges filed by plaintiff. (Pl.'s Ex. 3; Def. Ex. A.)

Plaintiff claims that Oswald would not move out of plaintiff's personal space, and threatened him with his posture.  Plaintiff also claims that Oswald put his face extremely close to plaintiff's face, and continued touching his chest and body to plaintiff's.  Plaintiff claims that Oswald was so close to him that he could "see the cracks in his lips and smell the cigarette on his breath."  According to plaintiff, Oswald whispered, "Are you calling my supervisor a liar?," to which plaintiff responded by asking "What are you doing?" and backed away.  Plaintiff claims that Oswald then gave him a "strange and unusual, queer gaze," and stated, "Nothing just standing here."  Plaintiff then walked away to report the incident to his immediate supervisor, SDO Ray Perez, because he "wanted to get away from Tim and the hostile & sexual environment he created."

Plaintiff claims that while he was trying to tell Perez what had just occurred, Oswald continued to talk over him.  Plaintiff reports that Oswald was acting emotional, aggressive and insistent, and wanted plaintiff to follow him alone into a room off of the work floor.  Plaintiff states that he raised his voice to ask for a union shop steward, because he did not trust Oswald.

At some point, plaintiff and Oswald went into a conference room, and sat down at opposite sides of the table.  Perez stood at the conference room door, watching the work floor and waiting for the shop steward.  While they were waiting for the shop

3

steward, plaintiff and Oswald continued their dialogue.
Plaintiff claims that Oswald made accusations about plaintiff and
expressed dissatisfaction with plaintiff's work.  Plaintiff
relates that in response, he "brought up some things that while
under duress [Oswald] coerced me and others into doing to make
himself look good and flawless with the mail to his fellow
supervisors, MDOs and especially the Plant Manager which he
always wanted so desperately to impress."

Plaintiff then claims that because he would not respond to
Oswald's insults, Oswald stopped talking.  According to
Plaintiff, Oswald took Perez into another room.  MDO Robert
Steelman, who was Oswald's superior, then came into the room to
inform plaintiff that he was being suspended for what Oswald
wrote in his written statement, which was that plaintiff had
threatened Oswald.  Plaintiff denies that he threatened Oswald,
and complains that Steelman did not ask plaintiff his version of
events, that he received a suspension without a shop steward
present, and that he was assured he would receive pay while
suspended, which did not turn out to be true.  Plaintiff was
escorted to his work area to collect his belongings and then out
of the facility.  No charges were ultimately filed, however, and
after a grievance filed by plaintiff's union, plaintiff was
permitted to return to work without objection from the Post
Office.  Plaintiff lost five days of pay, but no formal

4

discipline was ever initiated against him.

Plaintiff also claims that this was not the first time Oswald had harassed him.  Plaintiff claims that, as observed by two of his fellow mail handlers, Oswald blamed him for mail handling mistakes that were not his fault.  Plaintiff further claims that Oswald used other supervisors as pawns to get at him, "tapped [his] pay administratively after being adjusted between [him] and [his] supervisor," and he and other MDOs have not supported his military obligations.

Based on this conduct, plaintiff alleges that defendants are liable for Oswald's sexual harassment of him and the creation of a hostile work environment in violation of Title VII of the Civil Rights Act.  Plaintiff, who is African American, also alleges that defendants are liable for racial discrimination in violation of Title VII.

Defendants relate a different version of events, and deny that Oswald made any inappropriate, sexually harassing comments to plaintiff.  They also deny that plaintiff's race was a factor in his placement on non-duty status.  Relevant for the purposes of this summary judgment motion, Oswald admits that the two men brushed chests, but Oswald claims that it was plaintiff who started to walk by Oswald who was standing in the confined space. Oswald claims that plaintiff became loud, agitated and animated. Oswald agrees that plaintiff yelled for SDO Perez.  Perez states

5

that he observed both men using loud voices and were upset, with
plaintiff repeatedly calling for the shop steward.  Perez
instructed Oswald and plaintiff to take the matter off of the
work floor, and the three of them went into the conference room.
Perez heard the two men talking in a normal speaking tone, but at
some point Oswald approached Perez at the door and informed him
that plaintiff had made a statement to Oswald that he perceived
to be a threat.  Oswald claims that plaintiff said that plaintiff
"should have gone to [Oswald's] house in Stratford like I was
going to."  When Oswald asked if that was a threat, Oswald claims
that plaintiff replied, "You'll find out."  Oswald left the
conference room and prepared a written statement.  He also
notified MDO Steelman about the incident.

Because Steelman could not locate a shop steward, plaintiff
elected to have his fellow mail handler, Kevin Shanks, present
while Steelman and Perez interviewed him concerning the threat.
Plaintiff denied making the threat, but he did not write a
written statement, which Steelman states that he urged plaintiff
to do.

Perez states that pursuant to USPS policy he placed
plaintiff on emergency non-duty status, which was concurred to by
Steelman, and then escorted plaintiff from the building.
According to the controlling national contract in effect between
the USPS and the National Postal Mail Handlers Union, the USPS

was permitted to immediately place an employee in off-duty status without pay in a situation where retaining the employee on duty may be injurious to others.  Perez and Steelman state that because they never knew Oswald to lie, and because Oswald made a written statement alleging that plaintiff had threatened him, they agreed that the emergency placement for plaintiff was the best course of action at that time.  Steelman states that the emergency non-duty placement usually results in no formal discipline, and it is used to allow time for things to cool down.

Defendants have moved for summary judgment on all of plaintiff's claims.  Plaintiff has opposed this motion, and has also argued that it is premature because there are two outstanding subpoenas to two unions requesting copies of all grievances involving managers Steelman and Oswald.

## DISCUSSION

**A.   Jurisdiction**

This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e-16(c), which provides that any federal government employee, "within 90 days of receipt of notice of final action taken by a department, agency, or unit . . . if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as provided in section 2000e-5 of this title, in which civil action the head of the department, agency, or unit, as appropriate,

shall be the defendant."

**B.   Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56.

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has

8

met this burden, the nonmoving party must identify, by affidavits
or otherwise, specific facts showing that there is a genuine
issue for trial.  Id.  Thus, to withstand a properly supported
motion for summary judgment, the nonmoving party must identify
specific facts and affirmative evidence that contradict those
offered by the moving party.  Anderson, 477 U.S. at 256-57.  A
party opposing summary judgment must do more than just rest upon
mere allegations, general denials, or vague statements.  Saldana
v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

## C.  Analysis

### 1.  *Plaintiff's hostile work environment claim*

Plaintiff claims that Oswald's conduct on July 29, 2004 was
same-sex sexual harassment.  Title VII of the 1964 Civil Rights
Act, 42 U.S.C. § 2000e et seq., provides that "[i]t shall be an
unlawful employment practice for an employer . . . to
discriminate against any individual with respect to his
compensation, terms, conditions, or privileges of employment,
because of such individual's race, color, religion, sex, or
national origin," and the Supreme Court has unanimously held that
Title VII provides a cause of action for same-sex sexual
harassment.  Bibby v. Philadelphia Coca Cola Bottling Co., 260
F.3d 257, 262 (3d Cir. 2001) (citing Oncale v. Sundowner Offshore
Services, Inc., 523 U.S. 75 (1998)).  The Third Circuit has set

forth three types of potential same-sex harassment, including where the "harasser's conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her gender." Bibby Co., 260 F.3d at 262-63.  Plaintiff claims that Oswald committed this type of sexual harassment.[2]

When the Supreme Court determined that Title VII provides a cause of action for same-sex discrimination, it directed that a plaintiff, through inference or direct evidence, "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted

_____

[2]Many same-sex harassment cases based on the claim that the plaintiff was harassed because he or she did not fit gender stereotypes also involve claims of harassment based on the plaintiff's sexual orientation.  For example, in Kay v. Independence Blue Cross, 142 Fed. Appx. 48 (3d Cir. 2005), the plaintiff, who is gay, claimed that his coworkers harassed him because he was not a "real man," among other insults.  The court held that "the only reasonable reading of this record compels the conclusion that the reprehensible conduct [plaintiff] alleges was motivated by sexual orientation bias rather than gender stereotyping." Kay, 142 Fed. Appx. at 51.  Because neither the Third Circuit nor the Supreme Court has held that Title VII prohibits discrimination based on sexual orientation, see Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257, 261 (3d Cir. 2001), the court affirmed the grant of summary judgment in the defendant's favor, Kay, 142 Fed. Appx. at 51.  In the concurring opinion, however, Judge Rendell commented, "The line between discrimination based upon gender stereotyping and that based upon sexual orientation is difficult to draw and in this case some of the complained of conduct arguably fits within both rubrics." Id.  This problem does not present itself here because plaintiff does not claim that he is gay or that Oswald's alleged conduct was motivated by plaintiff's sexual orientation.

'*discrimina[tion]* . . . because of . . . sex.'" <u>Oncale</u>, 523
U.S. at 81 (quoting Title VII) (emphasis in original).  The Court
explained that Title VII is not "a general civility code," and
that "it forbids only behavior so objectively offensive as to
alter the 'conditions' of the victim's employment." <u>Id.</u>
"Conduct that is not severe or pervasive enough to create an
objectively hostile or abusive work environment--an environment
that a reasonable person would find hostile or abusive--is beyond
Title VII's purview." <u>Id.</u> (citation omitted).  This element is
crucial, and "sufficient to ensure that courts and juries do not
mistake ordinary socializing in the workplace--such as male-on-
male horseplay or intersexual flirtation--for discriminatory
'conditions of employment.'" <u>Id.</u>

The Supreme Court further elaborated that "the objective
severity of harassment should be judged from the perspective of a
reasonable person in the plaintiff's position, considering 'all
the circumstances,'" and that "[i]n same-sex (as in all)
harassment cases, that inquiry requires careful consideration of
the social context in which particular behavior occurs and is
experienced by its target." <u>Id.</u> (citation omitted).

Based on this standard, the Third Circuit has directed that
to state a claim for gender harassment under Title VII for
conduct by coworkers, a plaintiff must establish: (1) that he
suffered from intentional discrimination because of his gender;

11

(2) that the discrimination was pervasive and regular; (3) that the discrimination detrimentally affected him; (4) that the discrimination would have detrimentally affected a reasonable person of the same gender in that position; and (5) the existence of respondeat superior liability.  Kay v. Independence Blue Cross, 142 Fed. Appx. 48, 50 (3d Cir. 2005) (citing Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001)).  In applying these elements, a court "must still consider any stereotypical statements within the context of all of the evidence of harassment, and then determine whether the evidence as a whole creates a reasonable inference that the plaintiff was discriminated against because of his sex."  Kay, 142 Fed. Appx. at 50 (citation omitted).

Here, plaintiff claims that he was harassed by Oswald because plaintiff did not fit the gender stereotype of a man. The incident giving rise to this claim as alleged by plaintiff involved: (1) Oswald brushing his chest against plaintiff while moving through a tight space, (2) threatening him with his posture, (3) putting his face extremely close to plaintiff's face, (4) while Oswald continued touching his chest and body to plaintiff's, Oswald whispering, "Are you calling my supervisor a liar?", and (5) when plaintiff responded by asking "What are you doing?" and backed away, Oswald giving plaintiff a "strange and unusual, queer gaze," and stating, "Nothing just standing here."

12

Plaintiff's sexual harassment claim fails for two reasons. First, even accepting as true that Oswald was acting aggressively and using his body in a threatening manner, other than plaintiff's subjective perception that Oswald gave him a "strange, unusual, and queer"[3] gaze, no reasonable person could objectively conclude that the incident was motivated by a belief that plaintiff did not conform to the stereotypes of his gender. When one male coworker uses his body to intimidate another male coworker, the aggressor may be creating an environment that is, in layman's terms, hostile, but it does not automatically mean that the aggressor is discriminating against his male coworker.

More importantly, Plaintiff's claim also fails because this one incident does not demonstrate that Oswald's conduct was severe or pervasive enough to create an objectively hostile or abusive work environment.  Plaintiff complains that Oswald blamed him for mail handling mistakes that were not his, interfered with his pay, and was not understanding about his military service, but he has not made any other allegations that Oswald sexually

---

[3]It is unclear whether plaintiff's use of the term "queer" simply serves as a synonym to "unusual," or whether plaintiff is using that derogatory term to imply that Oswald looked at him in a sexually-suggestive manner.  Because plaintiff claims that he was harassed because he does not meet the male stereotype, although plaintiff does not elaborate on how he does not meet that stereotype, it can be inferred that plaintiff's use of the term "queer" indicates plaintiff's perception that Oswald was acting sexually suggestively.

harassed him.  This single incident, even if true, does not constitute an objectively hostile or abusive work environment such that it comes within Title VII's purview.  Consequently, summary judgment in favor of defendants on plaintiff's sexual harassment claim must be entered.

### 2.  Plaintiff's race discrimination claims

Plaintiff also claims that he has suffered disparate treatment because of his race.  A claim of race discrimination under Title VII uses the burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-05 (1974). Under that framework, a plaintiff must first establish a *prima facie* case.  The elements of a *prima facie* case depend on the facts of the particular case, and it cannot be established on a one-size-fits-all basis.  Jones v. School Dist. of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999).  Thus, in order to determine what *prima facie* case plaintiff must prove, it must first be determined what plaintiff's claims of discrimination are.

Plaintiff contends that Oswald treated him differently than nonmembers of a protected class, specifically with regard to the July 29, 2004 incident, and more generally on a day-to-day basis. Plaintiff also argues that SDO Perez and MDO Steelman did not properly investigate the incident on July 29, 2004 because they believed Oswald, who is white, over plaintiff, who is black, and

14

because Oswald was not reprimanded, while plaintiff was. Finally, plaintiff claims that two incidents involving other employees demonstrate that "whites" are entitled to leniency and that minorities who "push things too far suddenly are facing charges of misconduct." (Pl.'s Br. at 23.)

Based on these allegations, it appears that plaintiff is asserting a claim for disparate treatment generally, and specifically with regard to his placement on emergency non-duty status for the July 29, 2004 incident. Because plaintiff is claiming disparate treatment, rather than, for example, retaliation, plaintiff must prove the same *prima facie* case for both of these claims.

To prove a *prima facie* case of disparate treatment, a plaintiff must offer sufficient evidence that he was: (1) a member of a protected class, (2) qualified for the position, and (3) nonmembers of the protected class were treated more favorably than him. Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 318-19 (3d Cir. 2000) (citing Ezold v. Wolf, Block, Schorr and Solis Cohen, 983 F.2d 509, 522 (3d Cir. 1993)).

Should Plaintiff establish a *prime facie* case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. "The employer satisfies its burden of

15

production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.  The employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). This is a light burden.  Id.

Once the employer answers its relatively light burden by articulating a legitimate, nondiscriminatory reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation was merely a pretext for its actions, thus meeting the plaintiff's burden of persuasion.  Goosby, 228 F.3d at 319 (citing Reeves v. Sanderson Plumbing Products Inc., 530 U.S. 2097 (2000)).

Here, it is undisputed that plaintiff is a member of a protected class and that he was qualified for his position. Plaintiff, however, has failed to prove the third element of his *prima facie* case--that nonmembers of the protected class were treated more favorably than him.

First, with regard to his claims relating to Oswald, plaintiff's unsupported statement that Oswald did not treat nonmembers of a protected class as he treated plaintiff is

16

insufficient to prove a claim of disparate treatment.  Because it
is a plaintiff's burden to prove that similarly situated persons
were treated differently, Simpson v. Kay Jewelers, 142 F.3d 639,
645-46 (3d Cir. 1998), it is plaintiff's burden here to provide
evidence showing how Oswald treated nonmembers differently than
plaintiff.  Plaintiff simply states that there is no evidence on
the record that Oswald treated "whites in a similar fashion."
(Pl. Br. at 19.)  This is not enough.  Plaintiff cannot simply
fail to submit any proof of his claim, and then rely on that
absence of proof to prove the disparate treatment.

Plaintiff notes that he is relying on circumstantial
evidence, rather than direct evidence, to prove his case.
Indeed, because direct evidence of discrimination is often
difficult to provide, the Supreme Court established the
McDonnell-Douglas burden-shifting framework, which is applied
when most of a plaintiff's evidence is circumstantial. See Bell
Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1982 (2007) (stating
that if a discrimination claim is based primarily on
circumstantial evidence, the shifting evidentiary burdens imposed
under the framework articulated in McDonnell-Douglas apply).
Thus, it is understandable that plaintiff cannot provide direct
evidence that Oswald treated plaintiff differently because he is
black.  But, plaintiff has failed to produce any circumstantial
evidence to show that Oswald treated plaintiff differently

17

because he is black.  Circumstantial evidence to prove that
Oswald treated plaintiff differently would be evidence
demonstrating how Oswald treated non-minorities.  From the
evidence of how Oswald treated non-minorities, it could then be
compared to how Oswald treated plaintiff, and from there inferred
that Oswald disparately treated different classes.  Without
evidence of how Oswald treated nonmembers of a protected class,
no inference can be made.

Second, plaintiff has failed to prove his *prima facie* case
with regard to his claims that Perez and Steelman took the word
of Oswald over plaintiff's because Oswald is white, and also that
Perez and Steelman did not properly investigate the matter.
Plaintiff has not provided any evidence that Perez and Steelman
would not have believed Oswald or acted differently if plaintiff
was not a minority.  Because plaintiff's claim is that he was
treated differently than non-minorities, he has the burden of
showing how Perez and Steelman's actions would have been
different if plaintiff was not part of a protected class.
Plaintiff has failed to do so.

Third, with regard to plaintiff's proffer of the two
incidents involving other employees, they are not relevant to
plaintiff's claims.  The claims of those other employees involve
different events, with different supervisors at different times.
One involves a black employee who was terminated because she was

18

allegedly sexually harassing male coworkers, and the other incident involves a white supervisor who was accused of sexual harassment.  Plaintiff does not elaborate on how these unrelated incidents support his claim that Oswald, Perez and Steelman treated him differently based on his race.

Thus, plaintiff has not provided evidence to prove his *prima facie* case that nonmembers of the protected class were treated more favorably than him.  However, even if plaintiff could establish a *prima facie* case, he has not provided any evidence to rebut defendant's explanation for the resulting adverse employment action, which was plaintiff's placement on emergency non-duty status.[4]

Defendants' reason for placing plaintiff on emergency non-duty status was based on Perez's observation of Oswald and plaintiff's loud dispute, Oswald's written statement that plaintiff threatened Oswald, and the union contract permitting defendants to immediately place an employee on off-duty status without pay in a situation where retaining the employee on duty may be injurious to others.[5]

---

[4]As opposed to plaintiff's general claims of being treated differently, the only particularized adverse employment action claimed by plaintiff is his placement on emergency non-duty status.

[5]This explanation is sufficient to meet defendants' burden of demonstrating a nondiscriminatory reason for the adverse employment action.  See Fuentes, 32 F.3d at 763.

To meet the standard of proving that defendants' reason for placing him on non-duty status was a pretext, plaintiff must point "to some evidence, direct or circumstantial, from which a fact-finder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [the employer's] action." Foxworth v. Pennsylvania State Police, 228 Fed. Appx. 151, 158 (3d Cir. 2007) (citing Sheridan v. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996); Fuentes, 32 F.3d at 764)).

To prove that his race was the true motivating factor for placing him on emergency non-duty status, plaintiff relies on the fact that Perez did not hear a threat, the disputed fact that Steelman denied plaintiff a chance to tell his side of the story, and plaintiff's claim that there was no investigation into the event.  This is not enough for a reasonable factfinder to disbelieve defendants' articulated legitimate reasons or to believe that race was more likely than not the motivating cause for defendantsg plaintiff on non-duty status.

Plaintiff may disagree with his supervisors' decision, but "Title VII does not prohibit unfairness or wrongheaded decisions in the workplace." Ramos v. EquiServe, 146 Fed. Appx. 565, 569 (3d Cir. 2005) (citing Fuentes, 32 F.3d at 765 and Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir.

20

1997) ("[W]hen an employer articulates a reason for discharging
the plaintiff not forbidden by law, it is not our province to
decide whether that reason was wise, fair, or even correct,
ultimately, so long as it truly was the reason for the
plaintiff's termination.")).  Plaintiff has not provided evidence
to show that plaintiff's race had anything to do with Perez and
Steelman's decision to place plaintiff on non-duty status as
permitted by the parties' union contract.[6]  Consequently, summary
judgment must also be entered in favor of defendants on
plaintiff's Title VII race discrimination claim.

### 3.   Plaintiff's argument that summary judgment is premature

In his certification, plaintiff's counsel states that there
are two outstanding subpoenas to two unions requesting copies of
all grievances involving managers Steelman and Oswald.  Counsel
states that the purpose of these subpoenas is to discover from
grievances filed by the unions if there is a pattern of these
particular officials having problems with minorities, and only
with this information will plaintiff be able to present a
complete opposition to defendants' motion.  Counsel requests that
summary judgment be denied until the subpoenas are complied with,
or requests permission to supplement his opposition with the

_____

[6]To the contrary, defendants have provided evidence that
Steelman has made a total of four emergency placements before and
after the events of July 29, 2004, and in each of those four
occasions, the misconduct involved Caucasian males.

information when he receives it.

Counsel's certification was filed in July 2007, and to date, he has not supplemented his opposition with the information obtained from those outstanding subpoenas, and he has not updated the Court on the status of these subpoenas.  Because of this, it appears that plaintiff stands on his opposition as filed.  As a result, summary judgment it not premature.

**CONCLUSION**

Plaintiff has not provided sufficient evidence to defeat summary judgment on his sexual harassment and race discrimination claims.  The evidence on the record demonstrates, at most, an antagonistic relationship between plaintiff and one of his supervisors, and plaintiff has not demonstrated that the antagonism was caused by plaintiff's gender or race.  Consequently, summary judgment must be entered in favor of defendants.  An appropriate Order will issue.


Dated: March 18, 2008          s/ Noel L. Hillman

At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.